# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| v. | : | |
| RONALD FISHER | : | Mag. No. 08 - 2068 (JS) |

I, Brian Shannon, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Postal Inspector for the United States Postal Inspection Service and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached page and made a part hereof.

*B. Shan*

Brian Shannon, Postal Inspector
United States Postal Inspection Service

Sworn to before me and subscribed in my presence,

August 12, 2008 at Camden, New Jersey

HONORABLE JOEL SCHNEIDER
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

CONTENTS APPROVED

UNITED STATES ATTORNEY

By: _____
Assistant U.S. Attorney Matthew J. Skahill

Date: 8/12/08

## ATTACHMENT A

From in or about December 2006 through in or about August 2007, in Camden County, in the District of New Jersey and elsewhere, the defendant,

RONALD FISHER,

did knowingly and wilfully conspire and agree with Nathaniel Jenkins and others to defraud a financial institution and to obtain money and property owned by and under the control of, a financial institution, by means of false and fraudulent pretenses, representations and promises, contrary to 18 U.S.C. § 1344,

In violation of Title 18, United States Code, Section 371.

**ATTACHMENT B**

1.  I, Brian Shannon, am an Inspector with the United States Postal Inspection Service and have been so employed for 4 years. My duties as a Postal Inspector include the investigation of counterfeit checks schemes, credit card fraud, and identity theft. I have personally participated in this investigation and am aware of the facts contained herein based upon my own investigation as well as information provided to me by other law enforcement officers. Since this Affidavit is submitted for the sole purpose of establishing probable cause to support the issuance of a complaint and arrest warrant, I have not necessarily included each and every fact known by the Government concerning this investigation. Except as otherwise indicated, the actions, conversations, and statements of others identified in this affidavit are reported in substance and in part.

2.  The United States Secret Service (U.S.S.S.) and the United States Postal Inspection Service (U.S.P.I.S.) have been investigating a scheme involving the fraudulent use and manufacturing of counterfeit checks and identification cards by multiple individuals in the southern New Jersey area and in southeast Pennsylvania. The investigation has revealed that between approximately December 2006 and July 2007, at least three different individuals, identified below as Cooperating Source #1,

Cooperating Source #2, and Cooperating Source #3 (collectively "check cashers"), have passed or attempted to pass counterfeit checks at various banks in the southern New Jersey region and in southeast Pennsylvania. In each instance, the investigation has revealed that the check casher would enter the bank and present a counterfeit or stolen check to the teller, along with a fraudulent identification card. The fraudulent identification card would contain a picture of the check casher or one which closely resembled him/her and the name and personal identifiers of an unknowing third party, whose identity had been compromised. The counterfeit check would be made payable to this third party. The check casher would then exit the bank with the money.

3. The investigators have identified approximately $132,742.75 in loss, as a result of approximately 84 counterfeit and stolen checks being cashed at approximately 10 banks, by the three check cashers. The investigators have also identified an additional $10,220.55 worth of counterfeit checks, which the check cashers unsuccessfully attempted to pass. Law enforcement officers have confirmed that the three check cashers passed or attempted to pass the checks based on a review of video surveillance at the banks, interviews with the check cashers, and a review of the counterfeit identification cards used at the respective banks. Investigators have also spoken with several of the victims, whose

identities were compromised. In no instance were the check cashers authorized by the account holder to present the checks to the bank. As detailed more fully below, each of the check cashers stated that he/she cashed the checks on behalf of Nathaniel JENKINS and Ronald FISHER.

## Cooperating Source of Information #1

4. CS-1 cashed or attempted to cash at least 46 checks between December, 2006 and June, 2007 at 6 banks. The investigators have reviewed all of these check and determined that each of them were either counterfeited or stolen. The investigators have further determined that each of the banks where checks were cashed or attempted to be cashed were F.D.I.C. insured. CS-1 has pled guilty to bank fraud and is cooperating with the Government, as a part of the terms of his/her plea agreement.

5. CS-1 told law enforcement officials, in sum and substance, that he/she cashed counterfeit checks on behalf of Nathaniel JENKINS and Ronald FISHER. CS-1 stated that he/she met "Malik," later identified as JENKINS in December, 2006. During that meeting, JENKINS asked CS-1 if he/she wanted to make "extra money." When CS-1 responded that he/she did, JENKINS recruited CS-1 to cash counterfeit/stolen checks at banks on behalf of the counterfeit check ring in which JENKINS participated.

6

6. CS-1 told law enforcement officials that, approximately a week after CS-1 met JENKINS, JENKINS took CS-1 to Philadelphia, where CS-1 met with "Fish," later determined to be FISHER. CS-1 stated that FISHER gave CS-1 a check, a credit card and an identification card and asked him/her to go into a bank and cash the check. CS-1 stated that FISHER paid CS-1 approximately $100 to $300 for every counterfeit check that he/she cashed. CS-1 stated that he/she continued to cash checks for JENKINS and FISHER until June 2007. CS-1 stated that he/she would cash checks once or twice a week, and cashed two to three checks per day.

7. CS-1 described the check cashing scheme to law enforcement officials. JENKINS would drive CS-1 to the parking lot of the Big Lots department store in Clementon, New Jersey, which was close to the home of the person who printed the counterfeit checks. CS-1 believes that the check printer's name is "Tony." JENKINS would then drive FISHER to an apartment building behind Big Lots. CS-1 and JENKINS would then wait at the Big Lots parking lot. FISHER would then either walk back to the Big Lots parking lot or would be driven to the parking lot by "Tony" in a black Mercedes Benz. FISHER then delivered the counterfeit checks to JENKINS. FISHER would then drive CS-1 and JENKINS to various banks, where CS-1 would cash the counterfeit checks.

7

After CS-1 had successfully cashed the counterfeit checks, FISHER would drive CS-1 and JENKINS back to the Big Lots parking lot.

8.  CS-1 stated that FISHER would decide the banks where CS-1 would present the counterfeit checks. FISHER would give CS-1 instructions, including to put glue on his/her thumb to prevent the bank from taking her thumb print.[1] CS-1 told law enforcement officers that "Tony," FISHER, and JENKINS would all receive proceeds from the check and that JENKINS would pay CS-1 from his share.

9.  In furtherance of this scheme to defraud, on or about April 26, 2007, CS-1 presented a counterfeit check, drawn against P.M.'s checking account, and payable to J.I. at Commerce Bank N.A., in Sicklerville, New Jersey. At this time, CS-1 also presented to the bank teller a counterfeit identification card in J.I.'s name. CS-1 caused $1,936.77 to be unlawfully withdrawn from P.M.'s checking account and paid to CS-1.

## Cooperating Source of Information #2

10. CS-2 cashed or attempted to cash at least 17 checks between

---

[1] I am aware that one of the security features utilized by Wachovia Bank when a non-Wachovia customer attempts to cash a Wachovia check at a Wachovia Bank is to obtain the customer's thumb print.

8

January and March, 2007 at 9 banks. The investigators have reviewed all of the checks and determined that each of them was counterfeit or stolen. The investigators have further determined that each of the banks where checks were cashed or attempted to be cashed were F.D.I.C. insured. CS-2 has pled guilty to bank fraud and is cooperating with the Government, as a part of the terms of his/her plea agreement.

11. CS-2 told law enforcement officers, in sum and substance, that he/she cashed counterfeit checks on behalf of JENKINS and FISHER. CS-2 told the investigators that he/she met JENKINS in late 2006 and, thereafter, began cashing counterfeit checks on behalf of JENKINS and FISHER.

12. CS-2 described the check cashing scheme to law enforcement officials. CS-2 stated that JENKINS would contact CS-2 for the purpose of cashing the counterfeit checks. JENKINS would then pick CS-2 up in a car and CS-2 and JENKINS would then meet with FISHER, who would provide the counterfeit checks. CS-2, FISHER, and JENKINS would then travel to the bank, where CS-2 would enter the bank and present the counterfeit check to the teller. CS-2 stated that FISHER and JENKINS kept the proceeds of the checks and that JENKINS would pay CS-2.

ance of this scheme to defraud, on or about 7, CS-2 presented a counterfeit check, drawn and D.H.'s joint checking account, and payable to e Bank N.A., in Woodbury, New Jersey. At this presented to the bank teller a counterfeit card in J.I.'s name. CS-2 caused $2,462.77 to be drawn from W.H.'s and D.H.'s joint checking d to CS-2.

### rce of Information #3

d or attempted to cash at least 21 checks between y, 2007 at 7 banks. The investigators have the checks and determined that each of them was he investigators have further determined that each ere checks were cashed or attempted to be cashed nsured. CS-3 has pled guilty to bank fraud and is h the Government, as a part of the terms of reement.

law enforcement officers, in sum and substance, hed counterfeit checks on behalf of JENKINS and old the investigators that he/she met JENKINS, 2006. CS-3 stated that he/she, thereafter, began feit checks on behalf of JENKINS and FISHER.

16. CS-3 told the investigators that, in furtherance of the operation of the check counterfeiting scheme, JENKINS would pick up CS-3 in Pennsylvania. JENKINS and CS-3 would then drive together to Philadelphia to pick up "Ronnie", later identified as FISHER. CS-3 described Fisher as the middleman between JENKINS and the person who manufactured the counterfeit checks. CS-3 told investigators that FISHER obtained information about legitimate bank accounts that was used to manufacture the counterfeit checks. CS-3 stated that FISHER obtained that bank account information by stealing United States mail or legitimate checks from various businesses.

17. CS-3 stated that he/she and JENKINS would pick FISHER up in Philadelphia, near 23rd and Fox Streets. The three individuals would then drive to the Big Lots department store parking lot in Clementon, New Jersey. FISHER would then leave the vehicle and walk towards the apartment complex located in the rear of that parking lot. CS-3 stated that FISHER would typically be gone for approximately thirty minutes. FISHER would then return to the vehicle where JENKINS and CS-3 were waiting. Upon returning, FISHER would deliver to JENKINS and CS-3 a white envelope which contained what the conspirators referred to as "work," the counterfeit checks and counterfeit identification documents manufactured by their conspirator. CS-3 told the investigators

that, on a few occasions, a black male would drive FISHER back to the Big Lots parking lot in a dark Mercedes Benz.

18. CS-3 told investigators that after FISHER returned to JENKINS' vehicle, FISHER, JENKINS, and CS-3 would drive to various banks in the South Jersey area, where CS-3 would cash the counterfeit checks that he/she had received from FISHER. CS-3 stated that, in furtherance of this scheme, he/she cashed approximately 15 to 25 checks between January 2007 to July 2007. FISHER paid CS-3 between $100 to $300 for each check he/she successfully cashed. CS-3 also stated that FISHER had instructed him/her to put glue on CS-3's right thumb in order to alter CS-3's fingerprint when cashing a counterfeit check at a branch of Wachovia Bank. CS-3 stated that FISHER would occasionally forge signatures on the counterfeit checks. CS-3 stated he/she has been to the Big Lots parking lot approximately twenty times in order to receive counterfeit checks from FISHER and JENKINS.

19. In furtherance of this scheme to defraud, on or about April 6, 2007, CS-3 presented a counterfeit check, drawn against M.A.C.'s checking account, and payable to J.I. at Commerce Bank N.A., in Turnersville, New Jersey. At this time, CS-3 also presented to the bank teller a counterfeit identification card in J.I.'s name. CS-3 caused $1,936.77 to be unlawfully withdrawn

from M.A.C.'s checking account and paid to CS-3.

**AUGUST 17, 2007 ATTEMPT TO CASH TWO COUNTERFEIT CHECKS**

20. On August 17, 2007, CS-3, while wearing a concealed body wire recording device and acting under the direction of law enforcement officers, met with JENKINS and FISHER. CS-3 was under surveillance by law enforcement officers on this day, as she met with JENKINS and FISHER.

21. At approximately 9:20 a.m., JENKINS, driving a red Nissan Altima, picked CS-3 up at his/her residence in Lancaster, Pennsylvania. Surveillance officers followed JENKINS and CS-3 from Lancaster to an address located on Fox Street in Philadelphia. There, JENKINS picked up FISHER. Surveillance officers then tracked the Altima to the U.S. Copy Center located at Broad and Spring Garden Streets in Philadelphia. There, FISHER purchased laminates to make counterfeit identification cards. After purchasing the laminates, surveillance officers tracked FISHER and JENKINS to the area of 1503 Brand Avenue, in Clementon, New Jersey.

22. At approximately 12:52 p.m., law enforcement officers observed FISHER, driving the red Nissan Altima, arrive at 1503 Brand Avenue, in Clementon New Jersey. JENKINS and CS-3 were

passengers in the Altima. FISHER got out of the Altima while carrying a yellow envelope, and entered the residence at 1503 Brand Avenue. Surveillance officers were able to videotape FISHER entering the residence. JENKINS then drove the Altima, with CS-3 still a passenger, to the Big Lots department store parking lot, adjacent to the apartment complex.

23. At approximately 1:38 p.m., investigators observed FISHER and an individual, identified as E.W., exiting from the residence. FISHER was carrying a white envelope. A surveillance officer then observed E.W. drive FISHER toward the Big Lots parking lot in a dark blue Mercedes Benz. FISHER got out of the Mercedes and entered the Altima in which JENKINS and CS-3 were seated. FISHER then delivered the white envelope to CS-3. CS-3 later informed investigators that, when FISHER handed the white envelope to JENKINS, it contained counterfeit and/or stolen checks, and two new counterfeit identification cards, one in the name "Terri Sebree" and one in the name of "Amanda Ferraro."

24. At approximately 1:45 p.m., surveillance agents observed FISHER, JENKINS and CS-3, riding in the Altima, arrive at the Commerce Bank branch located on White Horse Pike in Oaklyn, New Jersey. Surveillance officers observed CS-3 enter the bank while FISHER and JENKINS remained in the Altima, which was parked in a

14

parking lot near the bank.

25. CS-3 carried a check into the bank, purportedly drawn on a Commerce Bank checking account, bearing check number 1687, dated August 15, 2007, and payable to "Amanda Ferraro" in the amount of $1,975.00. The account holder that had been printed on the check was Genes, Inc., located 122 E. Lancaster Avenue, Wayne, PA. CS-3, as instructed by the investigators, did not cash the check. CS-3 left the check with the bank teller and exited the bank. FISHER questioned CS-3 about what happened and CS-3 told FISHER and JENKINS that the bank did not cash the check because the signatures on the check and identification card did not match.

26. After CS-3 emerged from the Commerce Bank, surveillance officers followed FISHER, JENKINS and CS-3 as they drove in the Altima to a Wachovia Bank branch located on White Horse Pike in Audubon, New Jersey. FISHER and JENKINS remained in the Altima, which was parked near the bank, as CS-3 got out of the car to enter the bank. Before CS-3 entered the bank, FISHER told CS-3 to put glue on his/her thumb.

27. CS-3 carried a stolen check into the bank, drawn on a Wachovia Bank checking account, bearing check number 46196, dated August 16, 2007, and payable to "Amanda Ferraro" in the amount of

15

$1,975.00. The account holder that had been printed on the check was The Mutual Beneficial Association, Inc. CS-3, as instructed by the investigators, did not cash the check. CS-3 left the check with the bank teller and exited the bank. FISHER questioned CS-3 about what happened and CS 3 told FISHER and JENKINS that the bank said there was fraud associated with the account and that the bank, therefore, kept the check. After the two unsuccessful attempts, FISHER, JENKINS, and CS-3 then returned to Philadelphia, where FISHER was dropped off. JENKINS then brought CS-3 back to Lancaster, Pennsylvania.

28. On or about August 24, 2007, JENKINS asked CS-3 to cash counterfeit checks in King of Prussia, Pennsylvania. CS-3 told JENKINS that he/she could not cash checks on that day because of a conflict with his/her work schedule.

29. On August 27, 2007, JENKINS went to CS-3's residence and took back from CS-3 the counterfeit driver's licenses that FISHER had given to CS-3 on August 17, 2007. At that time, JENKINS told CS-3 that the conspirators no longer needed or wanted CS-3 to cash counterfeit and stolen checks because the conspirators had recruited another person to do so. JENKINS also told CS-3 that JENKINS had accompanied the new check casher when he/she had successfully cashed counterfeit checks on Saturday, August 25,

2007. Also on August 27, 2007, FISHER contacted CS-3 and asked him/her why he/she had been unable to cash counterfeit checks. CS-3 told FISHER that he/she needed advanced notice of the date and time when the conspirators wanted CS-3 to cash counterfeit checks.

30. On or about August 30, 2007, CS-3 received a telephone call from JENKINS. During that call, JENKINS asked CS-3 to cash counterfeit checks. CS-3 did not meet with JENKINS regarding that request, however.